Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 5961 | DATE | 5/21/2002 |
| CASE TITLE | Ronicia C. Daniel vs. Skudder Kemper Investments, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Skudder Kemper Investments, Inc. Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, Zurich's (f/k/a Skudder Kemper Investments, Inc.) motion for summary judgment is GRANTED [37-1]. Daniel, who bears the burden of proof at trial, has failed to make a showing sufficient to establish the existence of an element essential to her disparate treatment claim (that she was meeting the legitimate expectations of Zurich at the time of her discharge) and her retaliation claim (the existence of a causal connection between the filing of her complaint and her discharge). Thus, there is no evidence upon which a rational jury could find in her favor. All other motions are moot and terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | Document Number |
|---|---|---|---|
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| X | Notified counsel by telephone. | MAY 23 2002 date docketed | |
| | Docketing to mail notices. | | |
| X | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| klb (lc) | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONICIA C. DANIEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 00 C 5961 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| SKUDDER KEMPER INVESTMENTS, INC., | ) |
| | ) |
| Defendant. | ) |

DOCKETED
MAY 23 2002

## MEMORANDUM OPINION AND ORDER

Before this court is the four-count complaint of plaintiff, Ronicia C. Daniel ("Daniel"), alleging employment discrimination on the basis of race in the terms and conditions of her employment and retaliatory discharge. Zurich Scudder Investments, Inc. ("Zurich") (f/k/a Skudder Kemper Investments, Inc.) argues that summary judgment should be granted in its favor because Zurich's actions were caused by Daniel's poor work performance, not because of any racial or retaliatory motive. For the reasons set forth below, Zurich's motion for summary judgment is granted.

I.  **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Michael v. St. Joseph County, et. al, 259 F.3d 842, 845 (7th Cir. 2001). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences

-1-



drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511.

II.     Jurisdiction and Venue

Plaintiff's federal claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, and 42 U.S. C. § 1981. Jurisdiction over these claims is provided by 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5 (f)(3). Venue is proper in this Court under 42 U.S.C. § 1391 (b)

and 42 U.S.C. § 2000e-5 (f)(3). The plaintiff was employed in defendant's office in Chicago, Illinois and the facts giving rise to the complaint occurred in Chicago, Illinois.

III.  Factual Background

The plaintiff, Ronicia Daniel, is an African-American who lives in Chicago, Illinois. The defendant, Zurich, is a company which owns a family of mutual funds. Zurich does business in Chicago, Illinois. Daniel was employed as an Investment Representative at Zurich in Chicago, Illinois.

An Investment Representative receives inbound calls from shareholders of any of the mutual funds owned by Zurich, provides information to customers, processes certain transactions requested by customers and corrects problems that may arise. When an Investment Representative first begins working at Zurich, she spends six weeks in full-day training classes. The training includes daily classroom instruction (on, e.g., the market, updates, processing guidelines and the types of products Zurich offers), telephone instruction and a mentoring program. Investment Representatives are organized into teams of approximately 10 to 12 (though it could vary considerably) with a manager (also sometimes referred to as a supervisor) at the head of each team. Investment Representatives work in one of two divisions within Sales Support, either Shareholder Services or Broker Dealer Services.

There are five ascending levels of telephone representative positions: entry level (which is called Investment Representative), investment associate, senior investment associate, investment specialist and senior investment specialist. After six months as an Investment Representative,

the employee's salary may be increased based on merit.[1] After one year's employment, an Investment Representative may be eligible for promotion to investment associate. At subsequent annual reviews, an Investment Representative can be considered for further promotions. During Daniel's tenure; other African-American Investment Representatives did receive merit increases.

Kathryn Koury is Vice President at Zurich. She began at Zurich in 1989 in a position that was, during its time, comparable to today's Investment Representative. She was then promoted to a position in which she created Zurich's quality control department. She was subsequently promoted to manager, then director, and then Vice President. During Daniel's tenure at Zurich, Koury had overall responsibility for the shareholder's in-bound call center where Investment Representatives work. All calls from shareholders to Investment Representatives are tape recorded. The taping is done for two reasons: to provide protection against errors in financial transactions, and to evaluate the performance of the Investment Representatives. Kemper maintains a Quality Control Division which trains Investment Representatives, and then reviews their calls to evaluate their performance. Zurich's quality control system is described in its Quality Evaluation Guidebook. The rating system, effective September 1999, sets forth the call performance expectations raw point score or a percentage score (based on a maximum of 275 points) as follows:

| | |
|---|---|
| Needs Improvement | Less than 217 points (less than 78.9%) |
| Meets Expectations | 218-228 points (79.3% - 82.9%) |
| Exemplary | 229+ points (83.3%+) |

---

[1] Zurich maintains that it performs an evaluation after six months and Daniel denies that she received any such evaluation. Further, Daniel did not receive a salary increase after six months of employment.

Prior to September 1999, the B.E.S.T. Monitoring Guidebook contained the call performance expectations standard which was based on tenure as follows:

| Time on the Job | Quality Performance Measurements |
| --- | --- |
| 0-6 Months/ Investment Rep | 187-202 Points |
| 6-12 Months/ Investment Rep | 203-217 Points |
| 12+ Months/ Investment Rep | 218-228 Points |

Zurich expects that around 80% of an Investment Representative's calls will meet or exceed expectations. Calls from all Investment Representatives are evaluated by Quality Analysts who are separate from the Investment Representatives' managers in that the quality analysts report to their own managers. Each quarter, eleven randomly selected calls from each Investment Representative (and one additional call selected by the Representative if he or she chooses) are assigned randomly to Quality Analysts who evaluate the calls using the point system described in the Quality Guidebook. Investment Representatives are evaluated based on the raw individual scores and the consistency of the particular Representative's scores, including the percentage of calls that met or exceeded expectations.[2] Over time, different Quality Analysts review calls from any one Investment Representative. Managers also used the quality scores from phone calls that were monitored by the Quality Control Division to evaluate the performance of Investment Representatives. In addition to the formal evaluations done by

---

[2] Daniel denies that any method other than average scores are used to evaluate employees. The Guidebook expressly states, however, that "the overall rating of the call is to fall within an acceptable range." Further, Zurich's Quality Management Report sets forth not only the average scores, but the number of scores that met or exceeded expectations.

-5-

Quality Analysts, managers routinely review calls taken by the Investment Representatives in their teams.[3]

Zurich's attendance policy provides that "[e]xcessive absences, lateness, or sick days are managed according to their impact on the employee's performance, the employee's colleagues and manager, and the department's business needs. Payroll deductions are not made for absences, latenesses, early departures, extended lunch hours, or sick days for exempt or non-exempt employees. These concerns are managed as disciplinary matters. Absences are disciplined by the same progressive disciplinary process that Zurich uses for other disciplinary problems. The progressive discipline policy states that verbal warnings will normally be used first, followed by written warnings.

Daniel was employed by Zurich as an Investment Representative in the Shareholder Services division from July 13, 1998 until March 16, 2000. When Daniel was hired, the minimum entry level salary for Investment Representatives was $23,700, but Daniel was paid $25,000 because she had prior business experience. During her tenure at Zurich, Daniel served on three teams supervised by Brian Vance, Tina Donnelly, and Kevin Tully. Throughout her employment at Zurich, Daniel was in the entry level for Investment Representatives. Koury testified that she believed that Daniel did not meet expectations from early in her tenure. On

---

[3]Daniel denies that the call reviews done by Tully were for evaluation purposes. She asserts that the reviews were done solely for coaching purposes. While Tully stated that his review was not part of an Investment Representative's score for the Quality Analyst review, he also testified that "the purpose [for managers reviewing additional calls] is to use it as a tool in coaching, as well as become familiar with how your representatives are progressing and how they're doing." Further, Tully, as well as Daniel's other managers, issued performance reviews and evaluations to Daniel based on calls other than those included in the quarterly scores.

November 17, 1998, Daniel's manager, Brian Vance, gave her a "performance action plan" which concerned problems in Daniel's performance. Those problems included: scores of 175 and 185 on calls dated October 16 and 21, 1998; the need to bring down her average talk time; the use of correct resources when handling shareholder calls; the use of effective listening skills, improving her phone manner, improving operations and system knowledge; providing correct information; and handling requests from shareholders without assistance from others. On or about January 28, 1999, Vance gave Daniel a verbal warning which he memorialized in a memo. The warning concerned problems in Daniel's performance, particularly a score of 150 on a call dated January 22, 1999.

On or about July 22, 1999, Tina Donnelly (who had, by then, replaced Vance as Daniel's manager) gave Daniel a written warning. Donnelly's written warning was based, in large part, on Daniel's poor performance in that "[t]he attitude and professional demeanor demonstrated on these calls, as well as your responsiveness and ability to address the callers['] needs were not satisfactory." Donnelly described the calls detailed in Vance's previous memoranda on which Daniel's performance was unsatisfactory including the calls on which Daniel scored 175, 185 and 150; she addressed a more recent call (dated June 18, 19998 (sic)) on which Daniel's score was 185; and she warned Daniel that her quality averages for the first quarter of 1999 were 215, and that additional monitorings averaged 206.67 for three calls in April 1999 and 216.67 for three calls in May of 1999. Donnelly's written was also based, in part, on attendance problems in that Daniel had had three occurrences of unscheduled absences to that point during calendar year 1999. Not including a short term disability leave, at Zurich, Daniel was out of work on

unscheduled absences on the following days: December 7, 1998; April 1, 1999; May 27, 1999; June 21, 1999; June 22, 1999; and June 24, 1999.

On September 13, 1999, Daniel's annual salary was increased approximately 8% to $27,012 when the entry level salary for Investment Representatives generally was raised to a minimum of $27,000. Daniel did not receive a merit increase after six months. Similarly, Daniel did not receive a merit increase after one year at Zurich. In both instances, substandard job performance was the reason for her failure to receive a merit increase. On July 22, 1999, approximately one year after she was hired, she was given a written warning for poor job performance.

Kevin Tully became Daniel's supervisor in approximately September of 1999. On October 6, 1999, Daniel filed charge No. 2000CF2662 which the Illinois Department of Human Rights ("IDHR"). On or about February 22, 2000, Tully gave Daniel a Performance - Corrective Review. In the corrective review, Tully said "we have discussed multiple operational errors that we would not expect of a representative of your tenure." The various errors that are described in the corrective review include wiring money to the wrong account; failure to provide a customer with her extension number; incorrect instructions regarding the process of wiring funds and for faxed instructions for changing bank information; failing to listen carefully to customer's calls so as to respond to their requests; failing to discuss information in language that a particular customer could understand; recording incorrect figures for transactions; and inability to respond to relatively easy customer requests without the help of a supervisor. The corrective review also identified a 205 score for one call. Tully stated that he put Daniel on corrective review because "there was a pattern of performance not meeting expectations." When Tully put Daniel on

corrective review, he knew she had filed some sort of complaint about discrimination, but he did not know for sure what the nature of the complaint was; he did not know that she alleged race discrimination; and he did not know that IDHR had conducted a fact finding conference regarding her October 6th charge. During his tenure as a manager at Zurich, Tully also put another Investment Representative on corrective review and that individual was not African American.

On March 16, 2000, Tully gave Daniel a discharge notice. Tully made the decision to discharge Daniel. Before doing so, he talked to Paul Wisnewski in Zurich's Human Resources department and to Kim Koury. Tully decided to discharge Daniel after the call described in the discharge notice. At that point, he decided that Daniel had exhibited a "pattern of behavior" sch that her continued employment put Zurich and its shareholders at risk.

On March 17, 2000, Daniel filed charge No. 210A02341 with the Equal Employment Opportunity Commission. On August 8, 2000, the EEOC sent Daniel a notice dismissing both charges pursuant to the following finding: "Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes."

IV.  Analysis

Daniel alleges that Zurich violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Both claims are governed by the same standards. Gonzalez v. Ingersoll Milling Machine Company, 133 F.3d 1025, 1035 (7th Cir. 1998). Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race or color." 42 U.S.C. § 2000e-2(a)(1). Two methods exist for Daniel to satisfy his burden of proof: by direct evidence that racial discrimination motivated Zurich's decision to terminate her, or by the indirect, burden-shifting method of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).

Daniel offers no direct evidence of alleged racial animus. In this circuit, "direct evidence" is defined as evidence which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997) (quoting Randle v. LaSalle Telecommunications, 876 F.2d 563, 569 (7th Cir. 1989)). Here, direct evidence would be what Zurich and its employees said or did in the specific employment decision in question: terminating Daniel. Daniel does not contend that Tully ever said he discharged Daniel because she is black. Nor is there any claim Tully ever referred to blacks in racially derogatory terms.

Thus, Daniel's allegation centers on her assertion of indirect evidence of racial discrimination. Applying the McDonnell Douglas-Burdine burden shifting test, Daniel first must establish a prima facie case of racial discrimination by a preponderance of the evidence. Sample v. Aldi, Inc., 61 F.3d 544, 547 (7th Cir. 1995). Without a prima facie case, Daniel cannot withstand summary judgment. See Gilty v. Village of Oak Park, 919 F.2d 1247, 1250 (7th Cir. 1990). To do so, she must show (1) she is a member of a protected class, (2) her job performance met Zurich's legitimate expectations, (3) she suffered an adverse employment action, and (4) that another, similarly situated but not of the protected class, was treated more favorably. Stockett v.

Muncie Indiana Transit System, 221 F.3d 997, 1000-02 (7th Cir. 2000); Geier v. Medtronic, Inc., 99 F.3d 238, 241 (7th Cir. 1996).

Once a plaintiff has made this showing, there is a presumption that she was discriminated against, and the employer must come forward with a legitimate, non-discriminatory reason for the employment action. See McDonnell Douglas, 411 U.S. at 802; Lenoir, 13 F.3d at 1133. At this stage, the employer need not prove that it was actually motivated by the proffered reason. Rather, an employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Burdine, 450 U.S. at 257. Once the defendant has met this burden of production, the plaintiff must prove by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. Id. at 253; Plair, 105 F.3d at 348. While the McDonnell Douglas approach is often called a "burden shifting" method of proof, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

It is undisputed that Daniel is a member of a protected class. Zurich attacks Daniel's prima facie case on two fronts. First, Zurich argues that as to many of her claims, Daniel did not suffer a materially adverse employment action. Second, Zurich argues that Daniel did not meet Zurich's legitimate expectations. Further, according to Zurich, even if Daniel could make out a prima facie case, she cannot show that Zurich's reasons for its conduct are pretextual. Each of these contentions will be addressed in turn.

A.   Materially Adverse Employment Action

An adverse employment action is "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993). Adverse employment actions encompass more than simply the termination of employment or a decrease in salary. They also may include actions such as bestowing on an employee "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Crady, 993 F.2d at 136. However, "not everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996).

It is undisputed that Daniel's termination constitutes an adverse employment action. Daniel also alleges that she suffered adverse employment actions when she received negative evaluations, her seat was reassigned from a window to closer to her supervisor, she was denied Series 7 study materials, her calls were listened to more frequently than others, and she was not invited to meetings. The Seventh Circuit has held that unfavorable performance evaluations alone do not constitute adverse employment actions. See Oest v. Illinois Dept. of Corrections, 240 F.3d 605, 612-13 (7th Cir. 2001); see also Smart, 89 F.3d at 442. Daniel's seat reassignment may have made her unhappy because she no longer had a window seat, but it certainly did not rise to the level of an adverse employment action. Her responsibilities, job title, and benefits remained the same. The denial of Series 7 study materials similarly is not an adverse employment action. Zurich's policy on series 7 licensing materials expressly provides that "[e]ligibility for the Series 7 will be limited to Investment Associates and above." It is undisputed that during Daniel's tenure she was an Investment Representative, not an Investment

-12-

Associate. As Daniel was never an Investment Associate, Zurich's failure to provide her with Series 7 materials can not rise to the level of an adverse employment action. Daniel's claim that her calls were frequently monitored is not an adverse employment action. To begin with, monitoring of Investment Representatives calls was a normal practice engaged in for the dual purposes of coaching and evaluation. In addition, Daniel had received several negative reviews so it is only natural that she would be monitored closely to evaluate her improvement. As for Daniel's claim that she was not invited to meetings, there is simply no evidence to support that allegation.

B.   Zurich's Legitimate Expectations

Even if all of the claimed actions were adverse, Daniel must establish that she was meeting Zurich's legitimate expectations. She cannot satisfy this requirement by showing that her performance was adequate for some period of time during her employment. Hong v. Children Memorial Hospital, 993 F.2d 1257, 1262 (7th Cir. 1993). "[T]he critical issue is whether she was performing well in her job at the time of her termination." Id.

In Hong, the employer used an evaluation system based on point scores, much like Zurich's system. Although Hong's evaluations had been favorable during her first 17 years at work, her more recent scores were poor. The Seventh Circuit affirmed a summary judgment decision for the employer holding that "[a]gainst the record in this case, the plaintiff's bare assertion of disparate treatment is not persuasive." 993 F.2d at 1262. Similarly, in Villa v. Chicago, 924 F.2d 629, 631 (7th Cir. 1990), the court affirmed summary judgment for the employer even though the plaintiff had two positive reviews. In this case, Daniel had extremely low scores on some of her calls, did not meet the requirement that at least 80% of her calls meet

or exceed expectations and her performance did not improve even as she became more experienced. Zurich's use of its progressive discipline procedure to notify her of the need to improve her performance to remain employed did not prove succesful. . As in Hong, Daniel's assertion "that her disciplinary record is itself the result of discriminatory treatment is also unavailing." 993 F.2d at 1263. Daniel's performance was evaluated by five Analysts, three managers and a Vice President, all of whom found her work unsatisfactory. She offers no evidence that any one of these individuals, let alone more than one, held any racial bias. Moreover, all the Analysts gave her scores on some calls in which she met, or even exceeded expectations.

As a rule, this court will "not sit as a super-personnel department that reexamines an entity's business decisions" in cases where discrimination is alleged. Dale v. Chicago Tribune Company, 797 F.2d 458, 464 (7th Cir. 1986), cert. denied, 479 U.S. 1066, 107 S. Ct. 954, 93 L. Ed. 2d 1002 (1987). Zurich is in the best position to assess the relative qualifications of its employees and to determine when an employee's performance is so deficient as to potentially compromise the level of care to which its shareholders are entitled. In short, evidence that would permit a jury to infer that Zurich acted unlawfully, rather than because of Daniel's poor performance, is so lacking, that a jury should not be permitted to speculate as to Zurich's motives. See Coco v. Elmwood Care, 128 F.3d 1177, 1179 (7th Cir. 1997).

C.      Pretext

As this Court has determined that Daniel was not meeting the legitimate expectations of Zurich, she has failed to make out a prima facie case and a pretext analysis is unnecessary.

D.      Retaliation

Daniel also alleges that her discharge was retaliation for filing the October 6th charge with the IDHR. Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §§ 2000e-3(a). Under the McDonnell Douglas burden shifting method of proving discrimination, Daniel must first establish a prima facie case of retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). In order to do so, she must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action." Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1457 (7th Cir. 1994) (internal quotation marks and citations omitted). Once Daniel makes this showing, the burden shifts to the Zurich to state a "legitimate, nondiscriminatory reason" for the adverse action. Id. If Zurich is able to state such a reason, the burden shifts back to Daniel to show that the "proffered reasons are pretextual and that [the] actual reason was discriminatory." Id. Although the burden of production shifts under this method, "the burden of persuasion rests at all times on the plaintiff." Klein v. Trustees of Indiana University, 766 F.2d 275, 280 (7th Cir. 1985).

It is undisputed that Daniel engaged in statutorily protected expression in filing the October 6th charge and that she was eventually discharged. In order to meet the causation requirement for her retaliation claim, Daniel must prove that, but for her filing of the October 6th charge, Zurich would not have discharged her. Adusumilli v. City of Chicago, 164 F.3d 353, 363 (7th Cir. 1998). Daniel has not come forth with any evidence to support her belief that similarly

-15-

situated non-black employees who did not file charges were not disciplined for errors or discharged. Instead, Daniel cites the timing of the two events in support of her allegation. The relative timing of a discharge and the filing of a charge is probative of causation only if "the discharge took place on the heels of protected activity." Dey v. Colt Cont. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir. 1994). "As the period of time separating the two lengthens, the hint of causation weakens." Davidson v. Midelfort Clinic Ltd., 133 F.3d 499, 511 (7th Cir. 1998). Daniel was discharged on March 16, 2000, more than five months after she filed her Oct. 6th charge. "[W]hen so much time passes, before the adverse action takes place, the order in which the events occurred does not by itself suggest a causal link between them. Id. (five months); Fillpovic v. K & R Express Systems, Inc., 176 F.3d 390, 398-99 (7th Cir. 1999) (same); Hughes v. Derwinski, 967 F.2d 317, 321 (7th Cir. 1992) (four months). Even a period of only three months between the two events does not create a material issue of fact in the absence of other evidence that connects the two events. Sauzek v. Exxon Coal, USA, Inc., 202 F.3d 913, 918-19 (7th Cir. 2000). Moreover, once an employer offers evidence that an employee was discharged for poor performance (particularly when, as here, the performance problems arose before the plaintiff complained about discrimination), plaintiff creates no triable issue of fact merely because she filed a charge before she was discharged. Adusumilli, 164 F.3d at 363-64; Davidson, 133 F.3d at 512; Juarez v. Ameritech Mobile Comm., Inc., 957 F.2d 317, 321-22 (7th Cir. 1992). The poor performance, and documentation thereof, continued up to the time when Daniel was fired. Given this history, no jury could rationally conclude that Zurich would not have fired Daniel but for her Oct. 6th charge with the IDHR.
-16-

## Conclusion

For the foregoing reasons, Zurich's motion for summary judgment is GRANTED. Daniel, who bears the burden of proof at trial, has failed to make a showing sufficient to establish the existence of an element essential to her disparate treatment claim (that she was meeting the legitimate expectations of Zurich at the time of her discharge) and her retaliation claim (the existence of a causal connection between the filing of her complaint and her discharge). Thus, there is no evidence upon which a rational jury could find in her favor.

Enter:

_David H. Coar_

David H. Coar

United States District Judge

Dated: **May 21, 2002**